**IN THE UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF ARKANSAS**
**WESTERN DIVISION**

**GIDGET PAMBIANCHI**                                                        **PLAINTIFF**

**v.**                                    **Case No. 4:13-cv-00046-KGB**

**ARKANSAS TECH UNIVERSITY**                                          **DEFENDANT**

<u>**OPINION AND ORDER**</u>

Plaintiff Gidget Pambianchi brings this action against defendant Arkansas Tech University ("ATU") alleging discrimination on the basis of her gender and sexual orientation under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.[1]  Before the Court is ATU's motion for summary judgment (Dkt. No. 34).  Ms. Pambianchi has responded (Dkt. No. 42), and ATU has replied (Dkt. No. 47).  For the reasons that follow, the Court grants ATU's motion for summary judgment and dismisses with prejudice Ms. Pambianchi's Title VII claim against ATU.

**I.      Factual Background**

Ms. Pambianchi was as formerly employed by ATU as the head coach of ATU's softball team.  Ms. Pambianchi worked for ATU from July 2005 until ATU terminated her employment in April 2012.  Ms. Pambianchi was originally hired as an assistant softball coach, became the interim head softball coach, and was later retained as the head coach of the softball team.  During her employment, ATU's athletic director, Steve Mullins, was Ms. Pambianchi's direct supervisor.

---

[1]  To the extent Ms. Pambianchi now claims that she was paid less than male coaches and was repeatedly denied raises, Ms. Pambianchi did not assert in her operative complaint a claim of unequal pay due to gender under Title VII or the Equal Pay Act, 29 U.S.C. § 206(d)(1). Therefore, the Court declines to reach these issues.

ATU entered into a new one-year contract with Ms. Pambianchi each year between 2006 and 2011.  Ms. Pambianchi's 2011-2012 contract includes an addendum by which Ms. Pambianchi agreed to perform her duties and personally comport herself at all times consistent with good sportsmanship and "with the high moral, ethical and academic standards of the Athletic Department and the University."  (Dkt. No. 36-1, at 5).  The addendum further provides that Ms. Pambianchi agreed, at all times, to "exercise due care that all personnel and students under . . . her supervision, control or authority, comport themselves in a like manner."  (*Id.*; Dkt. No. 41, ¶ 4(B)).  Lastly, the addendum provides that Ms. Pambianchi agreed at all times to comply with and obey all federal and state laws, ATU regulations, and governing athletic rules and would exercise due care that all personnel or students under her supervision, control, or authority also comply with those laws, regulations, and rules.

ATU's sexual harassment policy states in part that sexual harassment is a violation of the law and ATU policy and will not be tolerated (Dkt. No. 36-2, at 11-16).  The policy further provides that what constitutes sexual harassment will vary with the particular circumstances of each case but "may be generally described as repeated and unwanted sexual behavior, such as physical contact and verbal comments or suggestions that adversely affect the working or learning environments of others."  (*Id.*).  The policy lists examples of sexual harassment, including:  "Use of sexual jokes, stories, analogies or images which are not related to the subject of the class or work situation" and "Sexually suggestive jokes, comments, e-mails, or other written or oral communications" (*Id.* at 12).  The sexual harassment policy establishes a procedure for handling complaints of sexual harassment and assigns the task of investigating complaints to the ATU Affirmative Action Officer, who was Jennifer Fleming at the time of the incidents at issue in this lawsuit.  The policy provides two options for reporting and resolving

matters involving alleged sexual harassment:   an informal resolution process and a formal complaint process (*Id.* at 13).

Ms. Pambianchi does not dispute the existence of ATU's sexual harassment policy, but she repeatedly contends in her summary judgment papers that the policy is invalid based on her allegations of the inconsistent and erroneous application of the policy.

### A.    Randall Trout Complaint

On March 2, 2012, while attending an athletic event out of state, Mr. Mullins received a message from assistant athletic director Kristy Bayer that Ms. Bayer had been contacted by a member of the softball team who stated that she had knowledge of inappropriate behavior between ATU assistant softball coach Randall Trout and a member of the softball team.   Mr. Mullins traveled back to Russellville, Arkansas, and after questioning Mr. Trout, the player in question, and witnesses, concluded that Mr. Trout had engaged in an inappropriate relationship with a player.   Mr. Mullins immediately terminated Mr. Trout's employment.   Mr. Mullins informed Ms. Pambianchi shortly thereafter, and Ms. Pambianchi stated that she had no knowledge of the relationship between Mr. Trout and the softball player.

ATU asserts that Ms. Pambianchi knew that Mr. Trout expressed a preference for "hanging out" with the players and that Mr. Trout and the player with whom he was later accused of having a relationship were "very close" but did not know that they were having a relationship (Dkt. No. 36, ¶ 7) (Dkt. No. 36-1, at 21-22).[2]   Ms. Pambianchi denies this assertion and states that she only knew that Mr. Trout, who was the hitting coach for the softball team, had

---

[2]    ATU has presented multiple excerpts of Ms. Pambianchi's January 20, 2014, deposition in support of its motion for summary judgment.   ATU chose to attach these excerpts as 21 separate exhibits to its Local Rule 56.1 statement of facts (Dkt. No. 36) and 10 separate exhibits to its reply (Dkt. No. 47).

spent time with students practicing hitting, which Ms. Pambianchi described in her deposition as "very normal" (Dkt. No. 41, ¶ 7; Dkt. No. 43-3, at 2-3).

According to ATU and Mr. Mullins's declaration, on March 13, 2012, Mr. Trout sent an email to Mr. Mullins and asked where to send a complaint of sexual harassment. In response, Mr. Mullins directed Mr. Trout to Ms. Fleming (Dkt. No. 36, ¶ 8; Dkt. No. 36-1, at 2). Ms. Fleming interviewed Mr. Trout on March 14, 2012, and recorded the interview. According to Ms. Fleming's declaration, Mr. Trout said at the beginning of the interview that he wanted to make it clear that he did not consider himself to be Ms. Pambianchi's friend and that Ms. Pambianchi had told him the type of things one would tell a friend, with which Mr. Trout said he was uncomfortable (Dkt. No. 36-2, at 2). Ms. Fleming states in her declaration that she explained both the informal and formal complaint options.

After being interviewed by Ms. Fleming initially and presented with the option of pursuing an informal or formal complaint, Mr. Trout elected to submit a formal written complaint on March 15, 2012, asserting that Ms. Pambianchi had sexually harassed him on two occasions based on conversations of a sexual nature with Ms. Pambianchi. First, Mr. Trout's complaint claims that, on December 1, 2011, while in an airport bar with Ms. Pambianchi on the way to a softball coaching convention, Ms. Pambianchi initiated a conversation with Mr. Trout regarding relationships in which Ms. Pambianchi asked Mr. Trout: "Let's just get it out there, are you one of those guys that just has to have sex all the time? Because I'm not, I could care less if I ever have sex." (Dkt. No. 36-2, at 21). Second, Mr. Trout's complaint states that, sometime in February 2012, Ms. Pambianchi came into the softball office and, in front of Mr. Trout and Ms. Pambianchi's graduate assistant, Tifani Moon, described a fight with her "girlfriend," informing Mr. Trout that she was a lesbian (*Id.*). Mr. Trout further states in his

4

complaint that, the next morning, with Ms. Moon present again, Ms. Pambianchi provided further information about her sex life, stating she had been with her girlfriend after engaging in a "threesome" at the request of her former fiancé, a man who was employed in the ATU football program at the time (*Id*. at 21-22).  Mr. Trout's complaint also states that Ms. Pambianchi said during the February 2012 conversation that "she wasn't into sex and could go without it but also informed us that [her companion] wanted it all the time."  (*Id.* at 22).  In addition to the two alleged incidents directed at him, Mr. Trout's complaint asserts that Ms. Pambianchi at some point made a comment to a softball player that "you need to get on your knees, I hear that's how you like it anyway" and that several players had spoken to Mr. Trout about their knowledge of Ms. Pambianchi's sexual orientation and stated that they were uncomfortable with Ms. Pambianchi's presence in the locker room while the players were changing (*Id.*).

Ms. Pambianchi disputes the specifics of Mr. Trout's complaint, although she repeatedly references a portion of her deposition in which she denies using the word "threesome" but does not address the other aspects of Mr. Trout's allegations (Dkt. No. 41, ¶ 11; Dkt. No. 43-3, at 6). In a declaration submitted with her summary judgment papers, Ms. Pambianchi contends that Mr. Trout had asked Ms. Pambianchi about her relationship and sex life and never told Ms. Pambianchi that she was making him feel uncomfortable (Dkt. No. 43-1).  Ms. Pambianchi has also submitted the declaration of Ms. Moon, in which Ms. Moon states that Mr. Trout identified himself as a friend, asked about Ms. Pambianchi's problems, and never said that the conversation made him feel uncomfortable (Dkt. No. 43-2).

In investigating Mr. Trout's complaint, Ms. Fleming interviewed both Ms. Pambianchi and Ms. Moon and other individuals identified in the investigation process.  Ms. Fleming's April 2, 2012, report to Mr. Mullins indicates that Ms. Moon made comments in her interview

with Ms. Fleming that are consistent with the statements in Ms. Moon's declaration (Dkt. No. 36-2, at 25). As to Ms. Pambianchi's alleged comment about a softball player getting on her knees, Ms. Fleming's report states that Ms. Pambianchi responded that this comment was just a joke and that the specific player involved also said that the comment was a joke (Dkt. No. 36-2, at 26). As to Mr. Trout's comments about players being uncomfortable in the locker room, according to Ms. Fleming's report, the four players mentioned in Mr. Trout's complaint all said that Ms. Pambianchi's presence in the locker room does not make them feel uncomfortable (*Id.* at 26-27).

Ms. Fleming's report contains no specific opinions, although Ms. Pambianchi contends that Ms. Fleming essentially expressed an opinion when she chose information to include and omit from Ms. Pambianchi's hour-long interview in drafting her written report (Dkt. No. 41, ¶ 20). Ms. Pambianchi does not offer specifics, but she stated in her deposition that Ms. Fleming should have "investigated it a little bit more" and that Ms. Fleming could have "added tons of things" in her investigation (*Id.*, ¶ 21; Dkt. No. 43-3, at 7-8). Ms. Fleming states in her declaration that it is not her practice to include recommendations or opinions in her reports; she claims her typical role is to collect and report information objectively (Dkt. No. 36-2, at 1-2). However, Ms. Fleming also states in her declaration that it is her opinion that discussing matters of a sexual nature, particularly with a subordinate, is a violation of ATU's sexual harassment policy (*Id.* at 5). Ms. Fleming states in her declaration that, as she interprets ATU's policy, it makes no difference whether Mr. Trout did not appear to be offended at the time of Ms. Pambianchi's statements about personal, sexual matters (*Id.* at 6).

B.     The Howard Branch Complaint

On March 28, 2012, Ms. Pambianchi, Mr. Mullins, and ATU President Robert Brown received *via* email a letter signed by "Howard Branch," who claimed to be a concerned tax payer and parent of a prospective ATU softball recruit (Dkt. No. 36-1, at 10).   The letter made a number of allegations, including:  that Ms. Pambianchi was a "known lesbian," which the writer found to be "very immoral" and not supportive of a family environment; that, in the past, female graduate assistants had been engaged in intimate relationships with players; and that Ms. Pambianchi had been observed in unflattering arguments with umpires and with punishing the team in an inappropriate manner (*Id.*).   The letter also alleged that information found on Facebook and Twitter accounts checked by the writer's daughter was "quite horrible" (*Id.*). Finally, the letter alleged that the writer had been told of "accusations of an alleged affair" between Mr. Mullins and "his athletic secretary" at ATU (*Id.*).

Four photographs accompanied the letter, the first three of ATU softball players that the Howard Branch letter suggests are from social media posts.  ATU states that the fourth picture is a photograph of Ms. Pambianchi, dressed in an ATU softball camp t-shirt, attending a post-game gathering with the team and "flipping off" the camera.  Ms. Pambianchi states that the first two photographs are still frames from a video that was shot at the home of the parents of an assistant coach in Illinois, that the third was taken on the team bus, and that the fourth was taken at a post-game gathering in Alabama at the home of an assistant coach at the time (Dkt. No. 41, ¶ 23).

ATU takes the position in its moving papers that "[n]either these allegations, nor the report of the investigation that followed, caused Pambianchi's dismissal."  (Dkt. No. 35, at 8). Ms. Pambianchi testified that Mr. Mullins told her that he normally did not respond to anonymous emails but, because the Howard Branch letter had a name attached to it, he would do

a little more research and respond (Dkt. No. 41, ¶ 24).  Ms. Fleming commenced an investigation

into the allegations in the Howard Branch letter on March 29, 2012, and submitted a report to Dr.

Brown on April 2, 2012, the same date as her report into Mr. Trout's complaint.  Ms. Fleming

states in her declaration that she emailed Mr. Branch but received no response.  On March 29,

2012, Ms. Fleming interviewed Ms. Pambianchi, Mr. Mullins, Ms. Moon, and four softball

players whose alleged misconduct was depicted in the materials provided in the Howard Branch

letter.  According to ATU and Ms. Fleming, during Ms. Fleming's interviews:  Ms. Pambianchi

denied the rumor that her personal life had any effect on the team's "family environment"; Ms.

Pambianchi informed Ms. Fleming that she had twice discovered a graduate assistant having

intimate relations with a team member, as confirmed by the interview with Ms. Moon; and Ms.

Pambianchi and Ms. Moon admitted that Ms. Pambianchi ran the team after a game as

punishment for a player's disrespectful behavior (Dkt. No. 36-2, at 7-8, 30-32).  ATU and Ms.

Fleming state that Ms. Fleming did not investigate these matters further; Ms. Pambianchi neither

admits nor denies this.  In addition, Ms. Pambianchi now contends that she did not have personal

knowledge of the relationships between a graduate assistant and a team member until after that

graduate assistant had left ATU (Dkt. No. 41, ¶ 26).

According to ATU and Ms. Fleming's report, the softball players Ms. Fleming

interviewed denied that the first two photographs attached to the Howard Branch letter were

taken in connection with any sponsored team activity, admitted that the third photograph was

taken on the team bus, and said that the fourth was taking at a post-game gathering in Alabama at

the home of the parents of the team's assistant coach at the time (Dkt. No. 36, ¶ 28).  Ms.

Fleming's report states that Ms. Pambianchi said she had no knowledge of her player's activities

on social media (Dkt. No. 36-2, at 35).

As to the allegation of an affair between Mr. Mullins and his athletic secretary, Ms. Fleming's report states that Mr. Mullins denied having an affair with the secretary (*Id.* at 32). Ms. Fleming states in her declaration that, even if the allegation that Mr. Mullins was having an affair with an unnamed secretary was true, this would not have been a violation of the sexual harassment policy so long as the affair was consensual.  Ms. Fleming states that ATU has an entirely different policy regarding consensual relations, which is attached as an exhibit to her declaration.  Further, Ms. Fleming states that the allegations against Mr. Mullins were reported as a rumor in the Howard Branch letter and that no complaint against Mr. Mullins was ever submitted to her (Dkt. No. 36-2, at 8, 36).

### C.    Ms. Pambianchi's Termination And Appeal

According to ATU and Mr. Mullins's declaration, Mr. Trout's complaint against Mr. Pambianchi was the first complaint of sexual harassment that he had ever been required to handle.  Mr. Mullins states in his declaration that he consulted with Ms. Fleming, Dr. Brown, and ATU's general counsel to inquire whether the conduct described in Mr. Trout's complaint and admitted by Ms. Pambianchi was a violation of ATU's sexual harassment policy and that all three advised that Ms. Pambianchi's conduct violated ATU's sexual harassment policy under their interpretation of the policy.  Ms. Pambianchi neither admits nor denies these statements but contends that the sexual harassment policy is invalid and that any interpretation of the policy was erroneous (Dkt. No. 41, ¶ 30).

Mr. Mullins states in his declaration that he understood and was advised that not terminating Ms. Pambianchi could expose ATU to liability in the event of another and more serious incident of sexual harassment.  On April 3, 2012, Mr. Mullins informed Ms. Pambianchi that she must either resign or be terminated.  Ms. Pambianchi declined to resign, and her

employment was involuntary terminated.   The parties agree that Mr. Mullins informed Ms. Pambianchi that she was being terminated for violating the sexual harassment policy and that no other matters were referenced and no other reason was given for her termination, although Ms. Pambianchi contends that this reason was pretext for discrimination (*Id.*, ¶ 33).

ATU's grievance policy provides for review of certain personnel decisions by a three-person panel of ATU employees that is empowered to make recommendations to ATU's president.   The decision of the president may be appealed by either party to the ATU Board of Trustees.   Following her dismissal, Ms. Pambianchi requested a grievance hearing which was conducted with the assistance of counsel on May 7, 2012.   Mr. Mullins, Ms. Fleming, and Ms. Pambianchi provided testimony and exhibits.   ATU states in its briefing that Ms. Pambianchi contended at the hearing that the sexual harassment policy was not violated because Mr. Trout did not appear offended.   The grievance committee voted two to one to recommend Ms. Pambianchi's reinstatement.

After reviewing the record of the grievance hearing, Dr. Brown declined to accept the committee's recommendation to reinstate Ms. Pambianchi.   Dr. Brown informed Ms. Pambianchi of his decision in a May 11, 2012, letter, in which he stated that he determined that Ms. Pambianchi was terminated for cause due to the fact that she:   failed to supervise and monitor adequately her employees, graduate assistants, and student athletes; engaged in conduct that reflected unfavorably on ATU; made inappropriate comments of a sexual nature to employees and student athletes she supervised which constituted a violation of ATU's sexual harassment policy; failed to exercise adequate control and supervision of the women's softball team; and failed to exercise good judgment and decision making (Dkt. No. 36-3, at 7).

Dr. Brown explains in his declaration submitted in support of ATU's motion for summary judgment that he agreed with Mr. Mullins that the statements Ms. Pambianchi admitted to making were in violation of the sexual harassment policy and that he found that the comment directed at a student athlete was sexual in nature. Mr. Brown states that additional facts Ms. Pambianchi admitted during the investigation of the Howard Branch letter "made it clear, if there was any doubt, that Pambianchi should be not be reinstated" (Dkt. No. 36-3, at 4). Specifically, Mr. Brown cites Ms. Pambianchi's "flipping the bird" at an ATU function while wearing an ATU t-shirt; Ms. Pambianchi's admission that she forced student athletes to run after a game as punishment, which Dr. Brown states is a violation of a very clear National College Athletic Association ("NCAA") rule; and that three admitted instances of sexual indiscretion between a coach and a student athlete raised serious questions as to Ms. Pambianchi's ability to supervise and monitor her employees and student athletes. Dr. Brown states that Ms. Pambianchi's efforts at the grievance hearing to explain these other infractions did not convince him that she should be reinstated.

On May 24, 2012, Ms. Pambianchi, through counsel, submitted a written appeal to the ATU Board of Trustees. The Board of Trustees voted on June 18, 2012, to affirm Dr. Brown's decision and deny Ms. Pambianchi's appeal.

## II.    Summary Judgment Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party. *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008).

"The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law." *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings. *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial. *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Ms. Pambianchi makes several incorrect assertions regarding the appropriate standard of review.  First, she suggests that she is not required to controvert ATU's proof unless it comes from disinterested witnesses, based on the Supreme Court's statements in *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133 (2005).  In the context of a Rule 50 motion for judgment as a matter of law, the Court stated that, although the court should review the record as a whole, "it must disregard all evidence favorable to the moving party that the jury is not required to believe."  530 U.S. at 151 (citing 9A Wright & Miller, Fed. Prac. & Proc. § 2529 (2d ed. 1995)). "That is, the court should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Id.* (quoting 9A Wright & Miller, § 2529).  To the extent that Ms. Pambianchi reads this to suggest that the Court should disregard the statements of interested witnesses, the Eighth Circuit has rejected such a reading of *Reeves*, stating:  "We do not believe such an insuperable bar exists.  Our sister circuits have recognized

that, in employment discrimination cases, a district court may consider testimony from the employer's agents at the summary judgment stage even though the agents are arguably interested parties." *Penford Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 662 F.3d 497, 507 (8th Cir. 2011) (citing *Traylor v. Brown*, 295 F.3d 783, 791 (7th Cir. 2002); *Sandstad v. CB Richard Ellis, Inc.*, 309 F.3d 893, 898 (5th Cir. 2002)). Rather, "[w]hether it is proper to credit the testimony of an interested witness will depend on the context and circumstances at issue.'" *Id.* (quoting 9B Alan Wright & Miller, § 2527 (3d ed. 2008)).

Ms. Pambianchi also contends that there is a special rule for summary judgment in discrimination cases, stating, "In discrimination cases, summary judgment should be granted when only one conclusion is clear because such cases often depend on inferences rather than on direct evidence." (Dkt. No. 43, at 12). In support of this statement, Ms. Pambianchi cites *Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994), and *Johnson v. Minnesota Historical Society*, 931 F.2d 1239, 1244 (8th Cir. 1991). The Eighth Circuit abrogated both of those cases in *Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011), clarifying that "[t]here is no discrimination case exception to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial." (internal quotation marks omitted). "Because summary judgment is not disfavored and is designed for 'every action,' panel statements to the contrary are unauthorized and should not be followed." *Id.*

### III.   Overview Of Claims

Ms. Pambianchi asserts only a claim under Title VII. She alleges a single count in her amended complaint, purporting to base her claim on two distinct theories: (1) that ATU treated similarly situated male employees more favorably than she was treated because she is a female,

and (2) that ATU treated similarly situated heterosexual employees more favorably than she was treated because she is a lesbian (Dkt. No. 24, at 1).  By prior Opinion and Order, the Court granted ATU's motion for judgment on the pleadings and dismissed Ms. Pambianchi's claims to the extent they are based on allegations that she was discriminated against solely on the basis of her sexual orientation (Dkt. No. 31).  As discussed in the Court's prior Opinion and Order, Title VII does not prohibit employment discrimination or harassment on the basis of sexual orientation.  *See Williamson v. A.G. Edwards & Sons, Inc.*, 876 F.2d 69, 70 (8th Cir. 1989) (per curiam) ("Title VII does not prohibit discrimination against homosexuals.").  The courts are not free to expand Title VII to prohibit discrimination on the basis of sexual orientation.  *See Bibby v. Philadelphia Coca-Cola Bottling Co.*, 260 F.3d 257, 265 (3d Cir. 2001); *Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 259 (1st Cir. 1999).  This Court rejected Ms. Pambianchi's attempts to fit her claim of sexual orientation-discrimination under a theory of sex or gender stereotyping, which she claimed was established by the Supreme Court in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) (plurality opinion).  *See Lewis v. Heartland Inns of Am., L.L.C.*, 591 F.3d 1033, 1039 (8th Cir. 2010) ("[A]n adverse employment decision based on gender non-conforming behavior and appearance is impermissible under *Price Waterhouse*."  (internal quotation marks omitted)).

Accordingly, this Court permitted Ms. Pambianchi to proceed only on her Title VII claim of sex or gender discrimination.  In her summary judgment papers, Ms. Pambianchi contends that ATU treated similarly situated male employees more favorably than she was treated in ATU's application of its sexual harassment policy and in assessing penalties for coaches based on player misconduct and NCAA violations.  Further, Ms. Pambianchi alleges pay disparity, a claim she never asserted in her pleadings.

IV.      **Analysis**

To establish her Title VII discrimination claim, Ms. Pambianchi can either provide direct evidence of discrimination or create an inference of unlawful discrimination under the three-step analysis set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973).  *Bone v. G4S Youth Servs., LLC*, 686 F.3d 948, 953 (8th Cir. 2012).  The Court will first address whether Ms. Pambianchi has presented direct evidence of discrimination.

A.      **Direct Evidence**

Direct evidence is evidence "showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated" the adverse employment action.  *Torgerson*, 643 F.3d at 1044 (quoting *Griffith v. City of Des Moines*, 387 F.3d 733, 736 (8th Cir. 2004)).  Direct evidence "must be 'strong' and must 'clearly point[ ] to the presence of an illegal motive' for the adverse action."  *Bone*, 686 F.3d at 953 (quoting *Griffith*, 387 F.3d at 736).  Direct evidence "most often comprises remarks by decisionmakers that reflect, without inference, a discriminatory bias."  *McCullough v. Univ. of Ark. for Med. Sciences*, 559 F.3d 855, 861 (8th Cir. 2009).

Ms. Pambianchi contends that she has direct evidence in the form of comments she alleges that Mr. Mullins made a few weeks prior to her termination.  Specifically, in her deposition, Ms. Pambianchi stated:

> Coach Mullins told me one day, he said, "Gidget, you would not be under so much trouble if you had a short haircut and you were 40 years old.  But because you're a blond and because you're not ugly, you become a threat to parents and you become a threat to these kids.  I mean, these kids could be attracted to you. You could be attracted to them.  These parents look at you like you could be their daughter.  And you're gay.  And that's not accepted and—not in our society.  And that's the reason why you're picked on."  He said, "If you were 40 years old with a short haircut, nobody would mess with you."

(Dkt. No. 43-3, at 11).

In her summary judgment papers and in her declaration, Ms. Pambianchi repeatedly contends that Mr. Mullins made statements that Ms. Pambianchi was "being picked on" because she is a woman and is gay and because being a gay woman is not acceptable in our society (Dkt. No. 43-1, ¶¶ 26-27). ATU states in its reply that Mr. Mullins denies making this statement, although ATU offers no citation to the record containing this denial, and the Court sees no discussion of this alleged conversation in Mr. Mullins's deposition or declaration. Even if this conversation occurred, ATU contends that Ms. Pambianchi's description of this conversation in her declaration and summary judgment papers contradicts the description she offered in her deposition, which ATU says is a "sham" attempt to create an issue of fact.

For purposes of summary judgment, the Court resolves any conflicting testimony in favor of the nonmovant unless "the inconsistency represents only an effort . . . to manufacture a sham issue of fact." *Roberts v. Park Nicollet Health Servs.*, 528 F.3d 1123, 1126 (8th Cir. 2008). A party cannot "create a genuine issue of material fact simply by submitting an affidavit that contradict[s] testimony at a prior deposition, where there were no 'legitimate reasons' for the filing of an inconsistent affidavit." *Id.* at 1126 (quoting *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983)). An inconsistent affidavit can generate a genuine issue of fact only if it does "not purport to raise a new matter, but rather to explain certain aspects" of previous testimony or if confusion contributed to the inconsistency. *Camfield Tires, Inc.*, 719 F.2d at 1364 (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894-895 (5th Cir. 1980)).

In her deposition testimony quoted above, Ms. Pambianchi claimed that Mr. Mullins made statements about her sexual orientation and her appearance as it pertains to her sexual

orientation.   She did not describe in her deposition alleged comments that pertained to her

gender.   In fact, Ms. Pambianchi described this conversation in response to counsel's question

asking why Ms. Pambianchi believes that the decision to terminate her would have been different

if she were heterosexual (Dkt. No. 47, at 35-36).   To the extent Ms. Pambianchi now claims in

her declaration that Mr. Mullins made statements regarding her sexuality *and gender*, she

contradicts her prior sworn deposition testimony.

Assuming Mr. Mullins made the comments described in Ms. Pambianchi's deposition,

the Court finds that these alleged comments are not direct evidence of discrimination on the basis

of Ms. Pambianchi's gender.   Courts have acknowledged the difficulty in drawing a line between

sex stereotypes, which are actionable under Title VII, and notions of heterosexuality and

homosexuality, which are not.   *See, e.g., Hamm v. Weyauwega Milk Products, Inc.*, 332 F.3d

1058, 1065 n.5 (7th Cir. 2003) ("We recognize that distinguishing between failure to adhere to

sex stereotypes. . . and discrimination based on sexual orientation. . . may be difficult."); *Howell*

*v. N. Cent. Coll.*, 320 F.Supp. 2d 717, 723 (N.D. Ill. 2004) (same).   Nevertheless, most courts

determine the distinction is necessary to adhere to binding precedent that sexual orientation is not

a protected characteristic under Title VII.   Sexual orientation alone cannot be the alleged gender

non-conforming behavior that gives rise to an actionable Title VII claim under a sex-stereotyping

theory.

Ms. Pambianchi also argues that there is direct evidence of discrimination based solely on

her contention that she did not actually violate the sexual harassment policy and that the policy is

invalid.   She claims that the Eighth Circuit "has repeatedly indicated that judgment for the

employer is not appropriate in cases involving circumstances where the employer cites as a

reason for discharge facts related to an allegation of wrongdoing on the part of the Plaintiff."

(Dkt. No. 43, at 20).  It is not clear why Ms. Pambianchi makes this argument in reference to whether she has presented direct evidence of discrimination.  Regardless, the Court agrees with ATU that Ms. Pambianchi's broad assertion is not an accurate statement of the law.  Ms. Pambianchi cites three Eighth Circuit cases involving retaliation claims where the employers' stated reasons for firing the employee were interwoven with the employee's protected conduct. *See Pye v. Nu Air, Inc.*, 641 F.3d 1011, 1022 (8th Cir. 2011) ("In this case, the proffered reason for termination is inextricably intertwined with the protected conduct at issue."); *Gilooly v. Mo. Dep't of Health & Senior Servs.*, 421 F.3d 734, 740 (8th Cir. 2005) (reversing summary judgment in employer's favor where the decision to fire the plaintiff, who had filed an internal charge of discrimination, was based on the investigator's belief that the plaintiff had lied about the substance of the charge during the investigation; whether the plaintiff had lied was an issue of fact for the jury); *Womack v. Munson*, 619 F.2d 1292, 1297 (8th Cir. 1980) (stating that employer's proffered justification for terminating the plaintiff was "inextricably related" to the protected activity such that the justification was not a sufficiently independent legitimate and non-retaliatory reason for discharge).  These cases are not on point here, and they do not stand for the proposition Ms. Pambianchi asserts.

For these reasons, the Court finds that Ms. Pambianchi has not presented direct evidence of discrimination on the basis of her gender.  Accordingly, the Court will analyze Ms. Pambianchi's claims under the *McDonnell Douglas* framework.

### B. *McDonnell Douglas* Analysis

Under the *McDonnell Douglas* analysis, Ms. Pambianchi bears the burden of establishing a *prima facie* case of discrimination.  *McGinnis v. Union Pac. R.R.*, 496 F.3d 868, 873 (8th Cir. 2007).  To make a *prima facie* case, Ms. Pambianchi must show that:  (1) she was a member of

the protected group; (2) she was qualified to perform the job; (3) she suffered an adverse employment action; and (4) circumstances permit an inference of discrimination. *Lewis*, 591 F.3d at 1038. "The required prima facie showing is a 'flexible evidentiary standard,'" and Ms. Pambianchi can satisfy the fourth part of the *prima facie* case in a variety of ways, such as by showing more-favorable treatment of similarly-situated employees who are not in the protected class, or biased comments by a decisionmaker. *Id*. at 1039-40 (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002)); *Pye*, 641 F.3d at 1019.

If Ms. Pambianchi makes a *prima facie* case, she "creates a presumption of unlawful discrimination, rebuttable through the showing of a legitimate nondiscriminatory reason for the action." *Tyler v. Univ. of Ark. Bd. of Trs.*, 628 F.3d 980, 990 (8th Cir. 2011); *see Burton v. Ark. Sec'y of State*, 737 F.3d 1219, 1229 (8th Cir. 2013). ATU's burden to show a legitimate, nondiscriminatory reason for the challenged action "is not onerous." *Bone*, 686 F.3d at 954. Once ATU provides a non-discriminatory, legitimate reason, "the presumption of discrimination disappears, requiring [Ms. Pambianchi] to prove that the proffered justification is merely a pretext for discrimination." *Twiggs v. Selig*, 679 F.3d 990, 993 (8th Cir. 2012). Ms. Pambianchi, as the plaintiff, has the burden of persuasion at all times. *Bone*, 686 F.3d at 955. Ms. Pambianchi's burden to show a genuine issue of material fact regarding pretext "merges with the ultimate burden of persuading the court that [she was] the victim of intentional discrimination." *Id*. (internal quotation marks and citation omitted).

### 1. *Prima Facie* Case And Proffered Justification

Ms. Pambianchi makes similar arguments as to both the *prima facie* case and pretext inquiries of the *McDonnell Douglas* analysis. Assuming without deciding that Ms. Pambianchi has established a *prima facie* case, the Court finds that ATU has articulated a legitimate,

nondiscriminatory reason for terminating Ms. Pambianchi.  Specifically, ATU cites its findings that Ms. Pambianchi violated ATU's sexual harassment policy.  As stated above, Mr. Mullins determined, based on consulting with Ms. Fleming, Dr. Brown, and ATU's general counsel, that Ms. Pambianchi's conduct violated ATU's sexual harassment policy.  All parties agree that this is the reason Ms. Pambianchi was given by Mr. Mullins for her termination by Mr. Mullins.  Ms. Pambianchi does not dispute making the statements at issue but contests whether her comments violated the sexual harassment policy.  Her arguments here are more appropriately addressed in the pretext inquiry.

Ms. Pambianchi also contends that ATU did not have a legitimate reason for terminating her based on her contention that ATU's sexual harassment policy is invalid.  First, she argues that ATU's sexual harassment policy is not in line with Supreme Court case law discussing what constitutes a hostile work environment or sexual harassment under Title VII.  In other words, Ms. Pambianchi suggests that ATU's sexual harassment policy may only cover harassment that is actionable under Title VII.  She fails to explain this argument or cite any legal authority for the proposition that ATU's sexual harassment policy is not a legitimate, nondiscriminatory justification for her termination unless the policy mirrors Title VII standards.  The Eighth Circuit has stressed that "the employment-discrimination laws have not vested in the federal courts the authority to sit as super-personnel departments reviewing the wisdom or fairness of the business judgments made by employers, except to the extent that those judgments involve intentional discrimination." *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 781 (8th Cir. 1995).

Ms. Pambianchi also argues that ATU's sexual harassment policy is not valid based on her contention that ATU failed to disseminate properly and effectively to its employees the information and procedures contained in the policy.  Here, she cites a statement from the Eighth

Circuit's decision in *Adams v. O'Reilly Automative, Inc.*, 538 F.3d 926, 932 (8th Cir. 2008), pertaining to whether the promulgation and dissemination of an anti-harassment policy satisfies one part of an employer's burden to establish the so-called *Ellerth-Faragher* affirmative defense. Under the *Ellerth-Faragher* defense, derived from *Burling Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 774 (1998), an employer may "show as an affirmative defense to liability that the employer had exercised reasonable care to avoid harassment and to eliminate it when it might occur, and that the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided." *Faragher,* 524 U.S. at 805.  In *Adams*, the Eighth Circuit noted that the promulgation and dissemination of an effective anti-harassment policy may establish that the employer exercised reasonable care to avoid and eliminate harassment.  538 F.3d at 929, 932.  The Court agrees with ATU that nothing in *Adams* suggests particular requirements that a sexual-harassment policy must meet before being cited as a basis for a legitimate, nondiscriminatory reason for termination.  Further, Ms. Pambianchi does not dispute that she attended a sexual harassment training put on for the ATU athletic department, although the parties acknowledge she does not remember the details of the training (Dkt. No. 41, ¶ 46).

In sum, the Court finds that ATU has articulated a legitimate, nondiscriminatory reason for terminating Ms. Pambianchi's employment.  Therefore, Ms. Pambianchi must prove that the proffered justification is merely a pretext for discrimination.  *Bone*, 686 F.3d at 955.

### 2.      Pretext

To prove pretext, Ms. Pambianchi must both discredit ATU's asserted reason and show that the circumstances permit drawing the reasonable inference that her gender was the real

reason for her termination.  *Johnson v. AT & T Corp.*, 422 F.3d 756, 763 (8th Cir. 2005).  "[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason."  *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993).  "There are at least two ways a plaintiff may demonstrate a material question of fact regarding pretext."  *Torgerson*, 643 F.3d at 1047.  First, "[a] plaintiff may show that the employer's explanation is unworthy of credence . . . because it has no basis in fact. Alternatively, a plaintiff may show pretext by persuading the court that a [prohibited] reason more likely motivated the employer."  *Id.* (alterations in original) (citations omitted) (quoting *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1120 (8th Cir. 2006)) (internal quotation marks omitted).  "A plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3) shifted its explanation of the employment decision."  *Lake v. Yellow Transp., Inc.*, 596 F.3d 871, 874 (8th Cir. 2010).

### a.  Direct Evidence And Timing

First, Ms. Pambianchi argues that her purported direct evidence—Mr. Mullins's alleged comments—coupled with the timing between those comments and her termination shows pretext.  As stated above, the Court disagrees that Ms. Pambianchi has presented any direct evidence of discrimination *on the basis of her gender or sex.*  As to timing, Ms. Pambianchi cites cases on whether timing between an employment decision and a protected activity may establish pretext in the context of a retaliation claim.  Ms. Pambianchi has not stated a retaliation claim, and her discrimination claim is based on a static characteristic, her gender or sex.  Under the facts and posture of this case, Ms. Pambianchi fails to explain how the timing of Mr. Mullins's comments and her termination suggest that ATU's justification for her termination was a mere

pretext for discrimination.  Ms. Pambianchi would have a stronger argument on this issue if Title VII prohibited discrimination on the basis of sexual orientation, given that Mr. Mullins's alleged comments referred to her sexual orientation and that Ms. Pambianchi states that she had not previously spoken with Mr. Mullins about her sexual orientation.  Title VII does not prohibit discrimination on the basis of sexual orientation, however.

> ### b.   Whether Ms. Pambianchi Actually Violated ATU's Sexual Harassment Policy

Although she does not make the argument specifically with regard to pretext, Ms. Pambianchi argues throughout her summary judgment papers that she did not violate ATU's sexual harassment policy.  The Eighth Circuit has said that, at the pretext stage, the "critical inquiry" in discrimination cases "is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge." *McCullough*, 559 F.3d at 861-62.  "A plaintiff seeking to survive an employer's motion for summary judgment must therefore show a genuine issue for trial about whether the employer acted based on an intent to discriminate rather than on a good-faith belief that the employee committed misconduct justifying termination." *Id.* at 862. "To prove that the employer's explanation was false, the employee must show the employer did not truly believe that the employee violated company rules." *Pulczinski v. Trinity Structural Towers, Inc.*, 691 F.3d 996, 1003 (8th Cir. 2012); *see also Johnson*, 422 F.3d at 762.

Ms. Pambianchi argues that ATU erroneously interpreted the sexual harassment policy and should not have found that she violated the policy because, as she contends, Mr. Trout was not offended by her comments.  Although Ms. Fleming states in her declaration that it does not matter whether Mr. Trout was offended by Ms. Pambianchi's comments, the facts are undisputed that Mr. Trout opted to file a formal complaint of sexual harassment against Ms. Pambianchi

based on her comments.  Dr. Brown stated that any sexual comments that make the recipient uncomfortable constitute sexual harassment (Dkt. No. 43-6, at 4).  Dr. Brown reiterated: "Harassment is something that you don't wish to have.  Harassment is when someone causes you discomfort." (*Id.* at 5).  When asked his recollection of Mr. Trout's allegations, Dr. Brown specifically stated that Mr. Trout complained of unwelcome and offensive comments (*Id.* at 10). Notably, Mr. Mullins stated that he consulted both Ms. Fleming and Dr. Brown in determining whether Ms. Pambianchi's comments to Mr. Trout violated the sexual harassment policy, and Dr. Brown affirmed Mr. Mullins's determination on this issue in declining the grievance committee's recommendation to reinstate Ms. Pambianchi.

On the record evidence before the Court, drawing all reasonable inferences in favor of Ms. Pambianchi, this Court determines that no reasonable juror could conclude that ATU did not in good faith reasonably believe that Ms. Pambianchi violated the sexual harassment policy based on the statements she admits making.  Ms. Pambianchi admitted to speaking to a subordinate about overtly sexual matters.  On this argument, Ms. Pambianchi has failed to establish a genuine issue of material fact regarding pretext.  Further, even if she could discredit ATU's asserted reason for terminating her, she also is required to demonstrate that the circumstances permit a reasonable inference of discriminatory animus.  *Gibson v. Am. Greetings Corp.*, 670 F.3d 844, 856 (8th Cir. 2012).  She fails to do so.

### c.    Alleged Shifting Explanations

Ms. Pambianchi also seeks to show pretext based on shifting explanations for her termination.  "Pretext may be shown with evidence that the employer's reason for the termination has changed substantially over time." *Loeb v. Best Buy Co.*, 537 F.3d 867, 873 (8th Cir. 2008).  Ms. Pambianchi argues that ATU gave shifting explanations for her termination in

24

that she was initially told she was terminated for sexual harassment when Mr. Mullins communicated his decision to terminate her but that Dr. Brown, in declining to reinstate her, "shifted his explanation by illogically adopting new explanations" for her termination that included allegations in the Howard Branch letter (Dkt. No. 43, at 32).  Dr. Brown's May 11, 2012, letter includes among the reasons for not accepting the reinstatement recommendation that Ms. Pambianchi had made inappropriate comments of a sexual nature to employees and student athletes she supervised that constituted a violation of ATU's sexual harassment policy, which is the same reason Mr. Mullins had terminated Ms. Pambianchi.  Dr. Brown gave additional reasons, but these do not contradict Mr. Mullins's justification for terminating Ms. Pambianchi, and Dr. Brown explains in his declaration that these additional reasons were reasons that made it clear to him that Ms. Pambianchi should not be reinstated.

The Court notes that Mr. Mullins and Dr. Brown may disagree on whether or not the issues raised by the Howard Branch letter constitute terminable offenses.  ATU, in its statement of facts, and Mr. Mullins, in his declaration, state that the allegations in the Howard Branch letter did not form the basis of Mr. Mullins's decision to terminate Ms. Pambianchi.  ATU and Mr. Mullins further state that Mr. Mullins considered the photograph of Ms. Pambianchi "flipping off" the camera and the admitted NCAA violations to be evidence of poor judgment but, in his opinion, were not grounds on their own for terminating Ms. Pambianchi (Dkt. No. 36, ¶ 27; Dkt. No. 36-1, at 4 ¶12).  Even if it could be argued that Dr. Brown's decision to cite these factors as additional grounds for rejecting the recommendation to reinstate Ms. Pambianchi evidences that Dr. Brown views these as terminable offenses, Mr. Mullins and Dr. Brown are different decisionmakers, and the record shows no shift in their individual explanations.  The Court cannot say any purported disagreement as between Mr. Mullins and Dr. Brown creates a triable issue as

to pretext by itself.  *See E.E.O.C. v. Trans States Airlines, Inc.*, 462 F.3d 987, 995 (8th Cir. 2006) (distinguishing precedent in which employers gave "two completely different explanations" from the facts of that case, where employer "never waivered" from its explanation for terminating the plaintiff).  The Court determines that, on the record evidence viewed in favor of Ms. Pambianchi, she has failed to establish a genuine issue of material fact regarding pretext based on her claim of shifting explanations for her termination.

### d.    Comparators

"At the pretext stage, 'the test for determining whether employees are similarly situated to a plaintiff is a rigorous one.'"  *Bone*, 686 F.3d at 956 (quoting *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 853 (8th Cir. 2005), *abrogated on other grounds by Torgerson*, 643 F.3d 1031).  To succeed at the pretext stage, Ms. Pambianchi must show that she and the potential comparators she identifies were "similarly situated in all relevant respects."  *Id.* (quoting *Rodgers*, 417 F.3d at 853).  The employees "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances."  *Wierman v. Casey's Gen. Stores*, 638 F.3d 984, 994 (8th Cir. 2011) (quoting *Cherry v. Ritenour Sch. Dist.,* 361 F.3d 474, 479 (8th Cir. 2004)).

Ms. Pambianchi asserts that Mr. Mullins is a comparator who has been accused of sexual harassment.  ATU contends that Mr. Mullins was not accused of sexual harassment.  Based on the record evidence before the Court, no individual came forward and made a formal complaint of sexual harassment against Mr. Mullins.  It is undisputed that Mr. Trout made such a complaint against Ms. Pambianchi.  *See Yeager v. City Water and Light Plant of Jonesboro, Ark.*, 454 F.3d 932, 934 (8th Cir. 2006) ("An employer that promulgates a sex harassment policy may reasonably distinguish between sexually oriented conduct that elicits a complaint from an

offended co-worker, and arguably comparable conduct that is nonetheless tolerated by co-workers without complaint."). Further, according to ATU and Ms. Fleming's declaration, Mr. Mullins's alleged affair would fall under the consensual relations policy, which states in part that a supervisor should not develop a sexual relationship with an employee when the supervisor has a position of authority with respect to that employee (Dkt. No. 36-2, at 36). *See Johnson v. Ready Mixed Concrete Co.*, 424 F.3d 806, 811 (8th Cir. 2005) ("Violations of different company policies do not necessarily support an inference that employees are similarly situated, particularly where one violation is considered more serious than the other.").

The Court acknowledges that, based on the record, ATU and Ms. Fleming's contention that Mr. Mullins's alleged affair would not fall under the sexual harassment policy may be at odds with Dr. Brown's testimony. Dr. Brown specifically stated in his deposition that the accusations of an alleged affair between Mr. Mullins and his secretary "certainly could be" a violation of the sexual harassment policy (Dkt. No. 43-6, at 9). Dr. Brown later reiterated that there are circumstances under which a consensual relationship between an employee and a subordinate employee could be a violation of the sexual harassment policy (*Id.* at 24). ATU contends that Dr. Brown also stated that he was not aware of any substantiation of Mr. Mullins's alleged affair with his secretary (Dkt. No. 47, at 66). No one came forward to complain about Mr. Mullins or to file a formal sexual harassment complaint against him.

Ms. Pambianchi does allege that Mr. Mullins received more favorable treatment in the investigation of the alleged affair as compared to the investigation of the allegations made by Mr. Trout against her. Based on the record evidence, viewing all facts in favor of Ms. Pambianchi, this, even if true, does not establish pretext under the circumstances of this case. Mr. Mullins was rumored to have an affair based on the allegations in the Howard Branch letter. That the

employer handled that investigation differently than the formal sexual harassment complaint made by Mr. Trout against Ms. Pambianchi does not establish pretext under the circumstances of this case. *See Malone v. Eaton Corp.*, 187 F.3d 960, 962 (8th Cir. 1999).

Ms. Pambianchi further argues that she was treated less favorably than similarly situated male coaches involved in infractions that are similar to those listed in Dr. Brown's reasons for not reinstating Ms. Pambianchi.  Specifically, she contends that male coaches of the football and basketball teams had players who were arrested for driving while intoxicated and failed drug tests and that other coaches committed NCAA secondary violations but that none of these coaches, including Mr. Mullins, who coached the football team through 2013, were reprimanded. Further, Ms. Pambianchi claims that two male coaches have been drunk in public in Russellville. In addition, Ms. Pambianchi alleged in her discovery responses in this case and in a complaint she submitted to ATU after her termination that members of the football and basketball teams made inappropriate posts on social media, which ATU investigated.

ATU argues that none of these coaches are appropriate comparators because they were not also accused of sexual harassment.  This Court agrees.  Ms. Pambianchi has come forward with no suitable comparators at the pretext stage.  There is no discussion in the record evidence of an employee or employees who dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstance.  Because she identifies no suitable comparators, Ms. Pambianchi has failed to establish through comparator evidence a genuine issue of material fact regarding pretext.

Based on the above, and considering the record evidence in the light most favorable to Ms. Pambianchi, the Court finds that ATU is entitled to summary judgment on Ms. Pambianchi's sex or gender discrimination claim under Title VII.

\*       \*       \*

For the foregoing reasons, the Court grants ATU's motion for summary judgment (Dkt. No. 34) and dismisses with prejudice Ms. Pambianchi's Title VII claim against ATU.  Judgment will be entered accordingly.

SO ORDERED this the 26th day of March, 2015.

_____
Kristine G. Baker
United States District Judge